FILED
2011 Mar-04  AM 08:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| SANG K. PYUN, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.: 7:09-CV-643-RDP** |
| | } | |
| PAUL REVERE LIFE INSURANCE | } | |
| COMPANY, et al., | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant The Paul Revere Life Insurance Company's Motion for Summary Judgment (Doc. # 34), Defendant Metropolitan Life Insurance Company's Motion for Summary Judgment (Doc. # 36), Plaintiff's Motion for Summary Judgment on the Counterclaim Filed by Defendants (Doc. # 41), Defendants' Motion to Strike Testimony of Dr. C.E. Herrington (Doc. # 58), and Defendants' Motion to Strike Testimony and Report of Lynn Hare Phillips (Doc. # 73). All motions are properly under submission before the court.

Plaintiff's Amended Complaint contains a total of eight claims against Defendants. (Doc. # 18). The first three counts allege breach of contract, ordinary bad faith, and extraordinary bad faith against Defendant Metropolitan Life Insurance Company ("Met Life"). (*Id.*). The remaining five counts allege breach of contract, ordinary bad faith, extraordinary bad faith, negligence, and breach of fiduciary duty as to Defendant The Paul Revere Life Insurance Company ("Paul Revere"). (*Id.*). Defendants' Counterclaim (Doc. # 23) contains two claims against Plaintiff: restitution of benefits paid and money had and received. (*Id.*). Plaintiff and both Defendants have moved for summary judgment as to all claims against them.

For the reasons below, Defendant Paul Revere's Motion for Summary Judgment (Doc. # 34) is due to be granted; Defendant Met Life's Motion for Summary Judgment (Doc. # 36) is due to be granted in part and denied in part; Plaintiff's Motion for Summary Judgment on the Counterclaim Filed by Defendants (Doc. # 41) is due to be denied; Defendants' Motion to Strike Testimony of Dr. C.E. Herrington (Doc. # 58) is due to be overruled as moot; and Defendants' Motion to Strike Testimony and Report of Lynn Hare Phillips (Doc. # 73) is also due to be overruled as moot.

## I.     STATEMENT OF FACTS

Plaintiff is at 61 year old anesthesiologist of Korean descent who has been practicing anesthesiology for approximately 30 years. (Doc. # 40 at 13-16).  In the mid 1980's Plaintiff purchased two disability policies from New England Mutual Life Insurance Company.[1] (Doc. # 18 at ¶ 7; Doc. # 38-1).  This case involves a dispute over those policies.

### A.     Plaintiff's Long Term Disability Claim

### 1.     Plaintiff's Policy with Met Life

Plaintiff has two disability policies with Met Life that provide a maximum monthly benefit of $5,000.00 each (Policy Nos. D098118 and D089651). (Doc. # 38-1).  The policies provide that:

> The Company will pay the Owner of the policy monthly income benefits:
> *       For Total Disability of the insured while the Policy is in force; and
> *       For Residual Disability which is related to a Total Disability that starts before the police anniversary on or next following the 65th birthday of the insured.
>
> Monthly income benefits will be paid for the period:
> *       Which starts at the end of the Waiting Period; and

---

[1] Defendant Met Life is the successor-in-interest by merger to Defendant New England Mutual Life Insurance Company (which ceased to exist on August 30, 1996.  Hereinafter, the court will reference the policies at issue as if they had been issued by Met Life.

> • Which ends when Total or Residual Disability end; whichever is later; but monthly income benefits will not be paid for any period after the end of the Maximum Period for Benefits.
> All payments will be subject to receipt by the Company of timely proof of loss.

(Doc. 38-1 at 6, 35).  At issue in this case is the residual disability provision of the policies.  The residual disability provision provides, in relevant part:

> "Residual Disability" means a disability of the insured:
> • Which directly follows a period of Total Disability that (a) started while the Policy was in force and before the policy anniversary on or next following the 65th birthday of the insured, and; (b) has continued for at least as long as the Residual Disability Qualification Period shown in Section 1; and
> • Which results from the same sickness or injury that caused the Total Disability it follows; and
> • Which causes a continuous Percentage Reduction of Earnings from all occupations of at least 20 percent.

(Doc. # 38-1 at 8, 37).  The polices do not contain definitions for part-time or full-time work.  (*See* Doc 38-1).

## 2.    Plaintiff's Disability Claim

In May 1999, Plaintiff fell from a ladder and injured his back. (Doc. # 40 at 26).  His fall resulted in an herniated disk that required surgery with cervical fusion. (Doc. 38-2 at 4). In June 1999, Plaintiff filed a disability claim with Met Life stating that he was totally disabled beginning May 6, 1999.  (Doc. # 38-2 at 4-9).  Met Life paid Plaintiff total disability benefits until January 2000, when Plaintiff informed Met Life that he would be returning to work on a part-time basis.[2] (Doc. # 38-2 at 10-15).  At that time, Met Life informed Plaintiff that he might qualify for Residual

_____

[2] Defendant Paul Revere had agreements with Met Life to provide certain claims services on behalf of Met Life with respect to certain policies issued by New England Mutual Life Insurance Company, which again was acquired by Met Life and is no longer in existence.  Two such policies are those issued to Plaintiff.  For this reason, the actions of Paul Revere on behalf of Met Life with regard to Plaintiff's claim will be referenced herein as the actions of Met Life.  Nevertheless, the contractual relationship between Met Life and Paul Revere will be discussed further in Section I.B.

3

Disability Benefits under his policies. (Doc. # 38-2 at 13-15). Based on Plaintiff's claim that he was residually disabled, Met Life paid him the full monthly benefit for the remainder of the first year following the first day of his claimed disability (May 6, 1999), and thereafter, paid him a portion of the monthly benefit based on the percentage of Plaintiff's claimed income loss. (Doc. # 38-2 at 18). Plaintiff received benefits under the policies until his benefits were terminated by a letter dated June 1, 2008. (Doc. # 38-2 at 91-101).

When Plaintiff returned to work in January 2000, he did so under an agreement with his employer whereby he would work 26 weeks per year without any time for vacation.[3] (Doc. # 54-5). It is undisputed that once Plaintiff returned to work he did so under an arrangement where he would work as a full-time anesthesiologist for one month and would be off work the following month. (Doc. # 40 at 32).[4] During the months that he was working, Plaintiff's job requirements were identical to the other full-time anesthesiologists in his group. (Doc. # 40 at 32).

While Defendant Met Life was aware that Plaintiff was working part time, it was not until February 2008 that Met Life's claim file indicates any awareness as to the nature of Plaintiff's part-time schedule. (Doc. # 38-2 at 35). In other words, February 2008 is the first time Defendant Met Life's records indicate knowledge that Plaintiff was working on a full time basis for one month but not working at all the following month. Prior to that time, Defendant's records indicate that Plaintiff was working 20-35 hours per week. (*See* Doc. # 38-2).

---

[3] After deducting 10 weeks of allotted vacation time, the full-time anesthesiologists at Plaintiff's practice work 42 weeks per year. (Doc. 40 at 28).

[4] Plaintiff's schedule shows that he worked full-time for at least two consecutive months on several occasions between January 2000 and June 2008. (Docs. # 39, 39-1, 39-2, 39-3). In particular, he worked full-time in October 2007, worked full-time through November 9, 2007, worked full-time in December 2007, and full time in January 2008. (Doc. # 38-2 at 51-61).

4

###      3.      Met Life's Ongoing Investigation into Plaintiff's Claim

In November 2000, Met Life's file indicates that it had questions concerning Plaintiff's claims such as Plaintiff's level of vocational functioning, how many days a week he was working, and whether he was doing any on-call work. (Doc. # 38-2 at 19). In December 2000, Bob Rodecker, a vocational consultant, spoke with Plaintiff on the phone and reported that "Dr. Pyun continues to work part time, 20 hours per week" and that he "has remained at part-time hours since January 2000 and there are no plans to increase his hours." (Doc. # 38-2 at 20); (Doc. # 61-1 at 2). Mr. Rodecker states that Plaintiff did not indicate that 20 hours per week was an average number of hours a week. (Doc. # 61-1 at 2). Throughout 2000 to 2003, Plaintiff continued to submit monthly progress reports stating that his present activities were "rest, exercise, and part-time working," and Met Life continued to pay residual disability based on Plaintiff's claimed disability and reported monthly income. (*See* Docs. # 40-1 at 34-53, 40-2 at 1-10).

Met Life's records reflect that in a March 2004 phone call with Met Life's disability benefits specialist, Cathy Bleau, Plaintiff represented that he "continue[d] to work an average of 20 hours a week" and that "[a] full time position in his occupation would require 70 hours a week." (Doc # 38-2 at 21) (Doc. # 61-2 at 1). In a later declaration, Ms. Bleau indicated that during her conversation with Plaintiff, they specifically discussed the amount he was working each week and that Plaintiff never gave any indication that he was working on a full time basis every other month. (Doc. # 61-2 at 2). On June 24, 2004, Gwynne Hupfer met with Plaintiff in his home. (Doc. # 38-2 at 22-26). Hupfer's report of that interview states that during the interview Plaintiff reported that he "is in constant pain in [his] neck and both of [his] shoulders" and that he "had very little energy and is constantly fatigued." (Doc. # 38-2 at 23). The report further states that Plaintiff's constant fatigue

limits the length of his workday – where Plaintiff previously worked 50-70 hours a week, he was currently only able to work "between 25-35 hours a week." (Doc. # 38-2 at 23).  Mr. Hupfer stated in a later declaration that Plaintiff clearly told him that he was working every week, but was working a reduced number of hours and that Plaintiff did not indicate that he was working a full time schedule every other month. (Doc. # 61-3 at 2).

In November 2007, Dr. Howard Taylor spoke to Plaintiff's attending physician Dr. Otero. At that time, Dr. Otero indicated that he thought Plaintiff should work less than 35 hours per week.[5] The letter from Dr. Taylor to Dr. Otero led Met Life to understanding that Plaintiff was working 35 hours per week. (Doc. # 38-2 at 33) (stating that Dr. Taylor believes that if Plaintiff "is doing all his regular activities for 35 hours a week he could perform the same activities for 40 or 50 or more hours a week").

In December 2007, Plaintiff was again interviewed by Mr. Hupfer.  The report of that interview indicates that Plaintiff stated that he does work some 70 hour work weeks, but those weeks are usually followed by a greatly reduced work load the following week (20-30 hours). (Doc. # 38-2 at 28).  The report further states that Plaintiff "indicated that his work schedule is 'dictated by the needs of The DCH Medical Center.'  When they need him to work a 70 hour week he complies with their wishes, but they understand that he can no longer do this on a regular basis." (Doc. # 38-2 at 28).  The report also states that Plaintiff said "you have to look at the big picture" (on a yearly basis) to see how many hours he has cut back his work schedule. (Doc. # 38-2 at 28).  Finally, the report indicates that Plaintiff was on-call an average of one weekend a month. (Doc. # 38-2 at 28).

---

[5] The letter from Dr. Taylor to Dr. Otero reflecting the contents of the telephone conversation of November 27, 2007 was amended by Dr. Otero to indicate that Plaintiff should work less. (Doc. 38-2 at 31-34).

In February 2008, Met Life disability specialist Susan Watkins attempted to contact DCH Regional Medical Center concerning Plaintiff's schedule. (Doc. # 38-2 at 36-37). She spoke with Chris Harris. (Doc. # 38-2 at 37). The entry concerning the phone call indicates that Mr. Harris does the scheduling for the anesthesiology department and stated that Plaintiff works every other month and that Plaintiff's partner, Leisa DeVenny works the months that Plaintiff is off. (Doc. # 38-2 at 37). The record further indicates that when Plaintiff is scheduled he works two 24 hour shifts on a Friday and Sunday and then 6-8 hours daily if not on call. (Doc. # 38-2 at 37). Mr. Harris does not recall speaking with anyone at any insurance company about Plaintiff and further states that he is the materials manager for the anesthesia department at DCH Regional Medical Center and has never been in charge of scheduling anesthesiologists in Plaintiff's group. (Doc. # 54-6).

On February 11, 2008, Met Life received a faxed response to a questionnaire it had sent on December 17, 2007 to Dr. C.E. Herrington concerning Plaintiff's schedule. (Doc. # 38-2 at 45). In response to the question asking how many hours a week Plaintiff was typically scheduled to work, Dr. Herrington responded that Plaintiff was scheduled for 20-25 hours per week over the course of a year and that Plaintiff's schedule varied week to week due to the nature of the practice of anesthesiology. (Doc. # 38-2 at 45). On February 13, 2008, Met Life sent a letter to Plaintiff informing him that it would need clarification on the schedule he was working based on his indication during the December 2007 interview that he had cut back his work schedule on a yearly basis. (Doc. # 38-2 at 41).

On May 6, 2008, Mr. Hupfer, a Met Life field representative, made an unannounced visit to Plaintiff's place of business. (Doc. 38-2 at 48). Mr. Hupfer met briefly with Plaintiff before meeting with Dr. Greg Billman, Chair of the Department of Anesthesiology at DCH Medical Center. (Doc.

# 38-2 at 48).   During that interview, Dr. Billman confirmed that Plaintiff and another physician shared a job in which each person would work a full month and then take a full month off. (Doc. # 38-2 at 49).  Dr. Billman also indicated that the "average work week" usually includes between 50-60 hours on the job, but can encompass as few as 30 hours and as many as 70 hours. (Doc. # 38-2 at 49).

On May 9, 2008, Mr. Hepfer again met with Plaintiff. (Doc. # 38-2 at 62-64).  The report of that meeting indicates that Plaintiff confirmed the fact he was working full time one month and then taking the following month off.  (Doc. # 38-2 at 63).  The report states that Plaintiff said that while at work no accommodations are made for him and that he is expected to carry his share of the group load.  (Doc. # 38-2 at 63).  Plaintiff also indicated that he was not able to work full time because at the end of a working month he is physically worn out and it takes him a while to recover.  He stated that he adjusts better when he can have a full month to recover from the month that he worked. (Doc. # 38-2 at 63).

### 4.    Met Life's Review and Ultimate Decision to Terminate Benefits

After obtaining information about the nature of Plaintiff's work schedule, Met Life had the claim file reviewed by several medical professionals in its office. On May 14, 2008, a nurse, Beth O'Brien, reviewed the claim file and stated that it was unclear how Plaintiff could function daily for one month and then require the next month to rest.  (Doc. # 38-2 at 69).  Ms. O'Brien recommended that the file be forwarded on to a physician for additional review. (Doc. # 38-2 at 69).  Met Life then forwarded the file to Dr. Jerry D. Beavers, a board certified physician in both occupational and internal medicine, who reviewed the entire claim file to date, including but not limited to all medication information, attending physician statements, clinical records, claimant's statements and

the clinical review by Beth O'Brien. (Doc. # 61-4 at 1); (Doc. # 38-2 at 72).  On May 19, 2008, he

completed a report finding that Plaintiff's full schedule for a month "confirms that he is able to

maintain activity through an entire shift." (Doc. # 38-2 at 73).  He further found that

> [t]here is no plausible rationale for why, after one month of such activity, a month of
> rest would be required. If [Plaintiff] can maintain such activity for a month, there is
> no reason [Plaintiff] would be unable to do such activity every month.  Due to a
> neurological condition like his[,] one could have more than normally fatigued
> muscles after a period of activity. But the fact that [Plaintiff] works a full schedule
> for a month at a time shows that he does not have this problem.  Fatigued muscles
> recover in a matter of hours with rest, not a matter of weeks.

(Doc. # 38-2 at 73-74).  Dr. Beavers further stated that given Plaintiff's known present activity level

it was not necessary to obtain an accurate measurement of his strength and fatigue. (Doc. # 38-2 at

74).  In conjunction with his review, Dr. Beavers contacted Plaintiff's attending physician, Dr. Otero.

(Doc. # 38-2 at 73).  Dr. Otero reported that Plaintiff should work part time "at a leisurely pace" due

to pain and easy fatiguing of the arm.[6]  (Doc. 38-2 at 102).  Dr. Otero further reported that he was

unaware of the nature of Plaintiff's part-time schedule and that he did not instruct Plaintiff to work

---

[6] After his conversation with Dr. Otero, Dr. Beavers sent a letter to him summarizing the
conversation and providing Dr. Otero an opportunity to make any amendments that he wanted. (Doc.
# 38-2 at 102-03).  Dr. Otero did make changes to Dr. Beavers' original letter. The full text of the
modified paragraph reads as follows:

> Dr. Pyun has chronic pain and moderate weakness of both arms as a residual from
> his cervical fusion.  You feel he should work part time "at a leisurely pace" due to
> pain and easy fatiguing of the arm.  You did not instruct Dr. Pyun to work a one-
> month-on-one-month-off schedule.  Dr. Pyun appears to be in pain when seen in the
> work setting.  You are not aware of what schedule Dr. Pyun is currently working.  He
> has also had moderate pain in muscle bulk of biceps and triceps bilaterally.

(Doc. # 38-2 at 102-03). Dr. Beavers reviewed the amendments made by Dr. Otero and found that
they did not change his original opinion because they were not relevant to the issue of working a one-
month-on-one-month-off schedule. (Doc. # 38-2 at 104).

a one-month-on-one-month-off schedule. (Doc. # 38-2 at 102).  Dr. Otero did report that Plaintiff

appeared to be in pain when seen in the work setting. (Doc. # 38-2 at 102).

After Dr. Beavers reviewed the file, he referred it for review by a Designated Medical

Officer. (Doc. # 38-2 at 79).  The filed was then reviewed by Dr. Alan Neuren, an on-site physician

who is board certified in neurology and psychiatry.  (Doc. # 38-2 at 80).  Dr. Neuren concluded as

follows:

> Information obtained indicates the insured is working full time on alternate months.
> This is not consistent with physical limitations or impairments from cervical disc
> disease or residuals.  A reduced work load on a daily basis would be credible, but the
> insured demonstrates the ability to work a full load for several weeks at a time.  The
> insured had arranged his work schedule with another anesthesiologist who desires to
> work alternate months. This insured's work schedule would be consistent with a life-
> style choice as opposed to a consequence of a physical impairment.

(Doc. # 38-2 at 80).

On June 1, 2008, Met Life informed Plaintiff's attorney that Plaintiff was not entitled to

further benefits. (Doc. # 38-2 at 91-101).  The decision was based on Plaintiff's work schedule, the

medical reviews, and the information contained in Plaintiff's file. (Doc. # 38-2 at 91-101).  Plaintiff

was notified of the opportunity to submit additional information in support of his claim or to appeal

the decision. (Doc. # 38-2 at 100).

**5.      Plaintiff's Supplemental Proof of Loss and Appeal**

On August 28, 2008, Plaintiff submitted the sworn statement of Plaintiff's attending physician

Dr. Otero, which was presented in the form of an interview of Dr. Otero by Plaintiff's attorney. (Doc.

# 38-2 at 106-12).   Dr. Otero's interview indicated that he has been treating Plaintiff for

approximately three years and sees him formally about once a year and informally on various

occasions at which time they discuss his case, therapy, ailments, and how Plaintiff is feeling. (Doc.

# 38-2 at 108).  Dr. Otero stated that he sees Plaintiff at the hospital from time to time.  (Doc. # 38-2 at 108).  He opined that Plaintiff's symptoms are reasonably attributed to the medical diagnoses he has been given and that he does not suspect Plaintiff of malingering. (Doc. # 38-2 at 108-09).  When asked whether Plaintiff's experience of pain, fatigue, or weakness was severe enough to interfere with the attention and concentration needed to perform tasks, he stated that "[t]hat will vary according to the physical activity that he has.  The more physical the activity, the more pain and weakness he will have.  The more pain and weakness, the less attention and concentration." (Doc. # 38-2 at 109).  Dr. Otero has not placed numerical restrictions on Plaintiffs lifting, but has told him to be very careful with heavy lifting, pushing, and  pulling.  (Doc. # 38-2 at 110).  He had advised Plaintiff to lighten his work load and thinks that his one-month-on-one-month-off schedule is reasonable considering his impairments.  (Doc. # 38-2 at 110).  Dr. Otero stated that it is reasonably consistent for Plaintiff to feel fatigued and weak after working for one month and that taking a month off to rest after working for one month is also reasonable. (Doc. # 38-2 at 110).  He does not think that Plaintiff could tolerate a schedule of more than 40 hours a week for several months in a row and that Plaintiff would likely suffer further injury if he did so. (Doc. # 38-2 at 110-11).

Dr. Otero's statement was reviewed by both Dr. Beavers and Dr. Neuren. (Doc. # 38-2 at 113-16).  Dr. Beavers concluded that while the transcript did include the new information that Dr. Otero felt that Plaintiff would be unable to tolerate working a 40 hour work for several months in a row, because it did not include any rationale for why such a schedule was required, it should not change the decision to terminate benefits. (Doc. # 38-2 at 114).  Dr. Beavers reiterated that "muscle fatigue is not a phenomenon that comes on gradually over a month's time and requires a month's rest, rather it is a phenomenon that comes on over a few hours and, if any rest periods were required, they would

have to be on a far more frequent basis than monthly. (Doc. # 38-2 at 114). Dr. Neuren concluded that "Dr. Otero's contention that the insured would be unable to work full time on a regular basis is speculative and inconsistent with the insured's known level of activity." (Doc. # 38-2 at 116). Dr. Neuren also pointed out that Dr. Otero did not provide any basis for his opinion that it would not be appropriate for Plaintiff to work full time. (Doc. # 38-2 at 116). Dr. Neuren further pointed out that there was no "physiologic basis that would support the contention that [Plaintiff] would only be capable of [working] on an every other month basis." (Doc. # 38-2 at 116). He also agreed with Dr. Beavers that the need for rest and recovery would be less prolonged than for a month at a time. (Doc. # 38-2 at 116). Dr. Neuren concluded that the information "provided would indicate that the insured elected to alter[] his practice pattern in conjunction with one of his partners as a life style choice and not due to a physical inability to do his work." (Doc. # 38-2 at 116).

On September 23, 2008, Met life notified Plaintiff's attorney that Dr. Otero's statement had been reviewed by Dr. Beavers and Dr. Neuren and that their contention that Plaintiff was capable of working full time had not changed. (Doc. # 38-2 at 126-27). Plaintiff was reminded of his opportunity to appeal and was notified that the claims file was being forwarded to the appeals department. (Doc. # 38-2 at 126-27). On December 15, 2008, Plaintiff notified Met Life of his appeal, including a Vocational Report from Mary Kessler, PhD. for consideration on appeal.

In forming her opinion for the Vocational Report, Dr. Kessler met with Plaintiff. (Doc. # 38-2 at 133). During that interview, Plaintiff reported that his major problem is fatigue and that he is unable to continue working month after month due to fatigue and increased pain during the months that he works. Plaintiff stated that he "only had a three-minute interval to save a person's life when he is working with that person, and he must be one hundred percent (100%) alert and ready to handle

any situation at any time." (Doc. # 38-2 at 135).  In his interview with Dr. Kessler, Plaintiff stated

that "working on a continuing basis without regular breaks every other month will keep him from

being mentally and physically alert enough to function at the necessary level to continue with his

job." (Doc. # 38-2 at 135).  In her Vocational Report, Dr. Kessler opined that:

> Based on the information from Dr. Pyun's treating physician, the interview with Dr.
> Pyun, and the review of the medical information, it is my opinion that Dr. Pyun is
> unable to maintain a continuous schedule of full-time work.  Therefore, in my
> opinion, his present schedule of part-time work is appropriate for his continuing
> levels of pain and fatigue for as long as he is able to maintain this part-time schedule.

(Doc. # 38-2 at 133-37).

Met Life referred the file, including Dr. Kessler's Vocational Report, to Richard Byard, an

in-house vocational rehabilitation consultant, for review.  (Doc. # 38-2 at 138-40).  Mr. Byard found

that:

> Given the significantly divergent opinions regarding the insured's level of
> demonstrated work capacity one would expect differing vocational conclusions.
> However, due to the limited scope of the information considered by [Dr.] Kessler, her
> vocational conclusions would not serve to alter the previous claim file conclusion
> that the insured retains the capacity to perform the material and substantial duties of
> his own occupation on a full-time basis.

(Doc. # 38-2 at 140).

On January 21, 2009, Met Life notified Plaintiff that it had decided to uphold its decision to

terminate benefits on appeal. (Doc. # 38-2 at 141-46). The Lead Appeals Specialist, Sharon Deraney,

stated that after a thorough review of Plaintiff's file, she agreed with the initial decision that Plaintiff

is not eligible for ongoing residual disability benefits.  (Doc. # 38-2 at 145).  Ms. Deraney found that

Plaintiff's ability to work full time every other month demonstrated his ability to work on a full time

basis.  (Doc. # 38-2 at 145).  On appeal, Met Life found that because Plaintiff demonstrated the

ability to work in his occupation on a full time basis and because there was no rationale for a one month off requirement, he was not eligible for further residual disability benefits.  (Doc. # 38-2 at 146).

On March 31, 2009, Plaintiff filed the instant lawsuit.

**B.     Contractual Relationship Between Met Life and Paul Revere**

In addition to suing Met Life, Plaintiff has also filed suit against Paul Revere, based on the contractual relationship between it and Met Life. (Doc. # 1). In 1990, New England Mutual Life Insurance Company, Met Life's predecessor, and Paul Revere entered into two agreements: a reinsurance agreement and a service agreement.  Under these agreements, Paul Revere provides Met Life with certain claim administration services on behalf of Met Life on New England Mutual Life Insurance Company policies, including Plaintiff's policies. (Doc. # 38-2 at 2).  As part of these agreements, Paul Revere agreed to indemnify Met Life for a portion of Met Life's liability under the New England Mutual Life Insurance Company policies that are the subject of the agreements between Met Life and Paul Revere.

Specifically, the reinsurance agreement provides that "[e]xcept for the claims incurred prior to January 1, 1990, Paul Revere will reinsure 80% and [Met Life] will retain 20% of the policy benefit liabilities of each policy in this block." (Doc. # 64 at 4).  It further provides that "Paul Revere will provide services as outlined in the Service Agreement." (Doc. # 64 at 4).  With regards to liability, the reinsurance agreement provides that "For claims incurred after December 31, 1989, Paul Revere indemnifies [Met Life] for 80% of policy benefits paid on policies reinsured under this agreement." (Doc. # 64 at 7).

The Service agreement provides that "Paul Revere will provide complete claim handling service for both of The New England portfolios including investigating and approving or disapproving of the claims. It will have the right to pay, compromise, reject or litigate all claims for which it is responsible. Paul Revere's decisions shall be relied upon by [Met Life]." (Doc. # 64-1 at 8).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). In making this assessment, the court must view the evidence "in the light most favorable to the nonmoving party." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1357 (11th Cir. 1999)). But while that is the case, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize*, 93 F.3d at 743 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592-94 (1986)).

Alternatively, there is no genuine issue of material fact if "the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)). Consequently , the court

"must view the evidence presented through the prism of the [movant's] substantive evidentiary burden." *Celtoex Corp.*, 477 U.S. at 254.

To respond, the nonmoving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." FED. R. CIV. P. 56(e)(2). Importantly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The underlying substantive law determines the materiality of a dispute and, hence, whether the dispute is sufficient to create a question of fact for the jury. The parties agree that Alabama law governs this controversy.

## III.   DISCUSSION

### A.   Metropolitan Life Insurance Company's Motion for Summary Judgment

#### 1.   Breach of Contract Claim

Plaintiff's disability policies provide that Residual Disability benefits will be paid for "a disability . . . which results from the same sickness or injury that caused the Total Disability it follows and *causes* a continuous Percentage Reduction of Earning from all occupations of at least 20 percent." (Doc. # 38-2 at 8, 37)(emphasis added). Met Life argues that it is entitled to summary judgment because Plaintiff's loss of income was not caused by his alleged disabling condition as required by the policy contracts.

A plaintiff can establish a breach of contract claim by showing "the defendant's nonperformance and damages." *State Farm & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999).

16

However, under Alabama law, in the context of an insurance claim the insured bears the initial burden of establishing insurance coverage by demonstrating that a claim falls within the insurance policy. *Shalimar Contractors, Inc. v. American States Ins. Co.*, 975 F. Supp. 1450, 1454 (S.D. Ala. 1997) (citing *Colonial Life & Accident Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967)).  In other words, in order for there to be a breach of the insurance contracts here, Plaintiff must show that his medical condition prevented him from working full time and thus caused a reduction in his income.

Met Life's main argument is that because Plaintiff is able to work full time for one month, sometimes more, it follows that he is able to work full time continuously.  However, Plaintiff has offered the opinions of both his treating physician, Dr. Otero, and a vocational expert, Dr. Kessler, as evidence that his disability requires a month of rest in between months of working full time, thus presenting evidence that his ability to work full time for one month at a time is not indicative of the fact that he is able to work full time on an ongoing basis.  The differing opinions between Met Life's Doctors (Dr. Beavers, Dr. Neuren, and Dr. Denver) and Plaintiff's treating physician and vocational expert create an issue of fact as to whether Plaintiff's ability to work full time every month demonstrates his ability to work full time year round.

Met Life argues that neither Dr. Otero's nor Dr. Kessler's testimony creates an issue of fact. Met Life points to the fact that Dr. Otero only saw Plaintiff is his office three times and did not charge him out of professional courtesy.  Met Life further notes to the fact that at one point Dr. Otero was unaware of the nature of Plaintiff's work schedule.  However, Met Life's assertions overlook the fact that Dr. Otero testified that he saw Plaintiff informally on various occasions and that he has had the opportunity to see Plaintiff from time to time at the hospital. (Doc. # 38-2 at 108).  Further, Met

Life points out that Dr. Otero agreed that most often, patients require a matter of hours or days to recover from fatigue and not months.  While this statement may indeed be true, in the immediately preceding statement Dr. Otero testified that sometimes patients require more than a month to recover from fatigue or muscle weakness depending on what the illness is. (Doc. # 38-4 at 20).  With respect to Dr. Kessler's testimony, Defendant Met Life argues that it should be discounted because the only bases for her opinions were Plaintiff's subjective complaints and Dr. Otero's medical recommendations. However, it is the job of the jury, not this court, to determine how much weight to accord any properly admitted testimony of Dr. Kessler.

Viewing the evidence in the light most favorable to the nonmoving party, in this case, Plaintiff, the court finds that there is an issue of fact as to whether Plaintiff's one-month-on-one-month-off schedule indicates that he is able to work full time on a continuing basis and whether his medical condition caused a reduction in his earnings.  Accordingly, summary judgment is due to be denied on the breach of contract claim.

### 2.        Ordinary Bad-Faith Claim

In order to recover on a "normal" bad-faith claim under Alabama law, a plaintiff must prove (1) an insurance contract between the parties and a breach thereof by the defendants; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal (*i.e.*, the absence of a debatable reason); (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason; and (5) if the intentional failure to determine the existence of a wrongful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is an legitimate or arguable reason to refuse to pay the claim. *Smith v.*

18

*MBL Life Assurance Corp.*, 589 So. 2d 691, 697 (Ala. 1991).  As the Alabama Supreme Court later

explained:

> The Plaintiff asserting a bad-faith claim bears a heavy burden.  To establish a prima
> facie case of bad-faith refusal to pay an insurance claim, a plaintiff must show that
> the insurer's decision not to pay was without an ground for dispute; in other words,
> the plaintiff must demonstrate that the insurer had no legal or factual defense to the
> claim. The insured must eliminate any arguable reason propounded by the insurer for
> refusing to pay the claim.  A finding of bad faith based upon rejection of an insurers
> legal argument should be reserved for extreme cases.  The right of an insurer to deny
> a claim on any arguable legal issue is to be as zealously guarded as is its right to
> decline benefits on any debatable issue of fact, the test of reasonableness being the
> same.

*Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001)(internal citations and quotation

marks omitted).  In other words, Plaintiff must show that he is entitled to a directed verdict on the

breach of contract claim in order to have the claim of bad submitted to a jury. *Employees' Benefit*

*Ass'n v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998).  "Ordinarily, if the evidence produced by either

side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial

thereof, the [normal bad-faith] claim must fail and should not be submitted to the jury." *Nat'l Sav.*

*Life Inc. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

Plaintiff cannot meet this heavy burden here.  Met Life has established that it had a debatable

reason to deny Plaintiff's claim.  It is undisputed that Plaintiff was working a schedule where he

would work full time for one month and then take the following month off.  Met Life has offered the

opinions of numerous doctors to say that because Plaintiff is able to perform the duties of his

occupation for one month at a time, there is no medical reason why Plaintiff shouldn't be able to

work full time on an ongoing basis. The final denial letter sent to Plaintiff provided Plaintiff with

the same reason for denial – that Plaintiff's demonstrated ability to work full time for one month

combined with the lack of rationale as to why he requires one month off to rest afterwards at least suggests that he is able to work full time on an ongoing basis. (Doc. # 38-2 at 146). Because Met Life had a debatable reason for denying Plaintiffs claim, summary judgment is due to be granted with regard to the ordinary bad faith claim.

### 3.        Extraordinary Bad-Faith Claim

In order to recover under a theory of abnormal bad faith failure to investigate a claim, the insured must show "(1) that the insurer failed to properly investigate the claim or subject the results of the investigation to a cognitive review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *Simmons v. Congress Life Inc. Co.*, 791 So. 2d 371, 379 (Ala. 2000).   "In the 'abnormal case', bad faith can consist of: (1) intentional or reckless failure to investigate a claim, (2) intentional or reckless failure to properly subject a claim to cognitive review, (3) the manufacture of a debatable reason to deny a claim, or (4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim." *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005).

As a preliminary matter, Met Life argues that, as with ordinary bad faith, a claim for extraordinary bad faith cannot stand when an insurer has a lawful basis for denial.  In making this argument, Met Life cites *Weaver v. Allstate Inc. Co.*, 574 So. 2d 771 (Ala. 1990) in support of its contention that "Alabama law is clear . . . that regardless of the imperfections of [insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim." *Id.* at 775 (internal citations omitted).  In response, Plaintiff relies upon *Mutual Service Cas. Ins. Co. v. Henderson*, 368 F.3d 1309 (11th Cir. 2004) for the contention that under Alabama law "providing an arguable reason for denying an

20

'abnormal' bad faith claim does not defeat that claim." *Id.* at 1315. This court is fully aware that there are cases when, under Alabama law, it is appropriate to submit an extraordinary bad-faith claim to a jury even though a legitimate or arguable reason for denying the claim exists. However, this case is distinguishable from those situations. *See Jones v. Alfa Mutual Ins. Co.*, 1 So. 3d 23 (Ala. 2008) (allowing the abnormal bad-faith claim to survive summary judgment even though there was a debatable issue when support for that debatable issue was obtained after the denial of the claim); *Henderson*, 368 F.3d 1309 (finding that summary judgment was not appropriate on an abnormal bad-faith claim when insurer did not have a debatable reason for denying insured's claim when it issued its first two denial letters, even though insurer later conducted an investigation that resulted in a debatable reason for denial of the claim). This case is notably different from these decisions because here, Met Life had a legitimate or debatable reason for denial *at the time it denied Plaintiff's claim*, making this case analogous to the *Weaver* case. *Weaver*, 574 So. 2d 771; *see also Singleton*, 928 So. 2d 280 (holding that summary judgment on insured's abnormal bad faith claim was appropriate when insurer had a evidence of a reasonably debatable reason for denial and insured subsequently failed to produce evidence to contradict that debatable reason).

In *Weaver*, the plaintiff was in a motorcycle accident and sued his insurer for its refusal to pay his claim for uninsured motorist benefits. After the accident, but before denying the claim, the insurer immediately began investigating the claim by talking with the plaintiff, reviewing the accident report, discussing the accident with the investigating officer and eye witness, and reviewing a recorded statement from the driver of the other vehicle involved. *Id.* at 772-73. After reviewing all of that information, the insurer denied the claim. With regard to plaintiff's allegation that the insurer failed to adequately investigate the accident, the court found that there was no triable issue

because the insurer's "investigation established a legitimate or arguable reason for refusing to pay the claim, which is all that is required." *Id.* at 774.  The court further stated that "Alabama law is clear . . . that regardless of the imperfections of [insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay claim." *Id.* at 775 (quoting *State Farm Fire & Cas. Co. v. Balmer*, 891 F.2d 874, 877 (11th Cir. 1990).  Like the insurer in *Weaver*, Met Life had a reasonably debatable reason for denying Plaintiff's claim at the time of its denial of Plaintiff's claim.  Accordingly, Met Life is entitled to summary judgment on Plaintiffs extraordinary bad-faith claim.

But even assuming *arguendo* that the existence of a reasonably arguable or legitimate reason for denial of the claim at the time the claim was denied does not preclude recovery under extraordinary bad faith, the court would still find that Plaintiff has failed to offer substantial evidence showing that the facts of this case fall within one of the categories of cases that constitute extraordinary bad faith.  In *Slade*, the Alabama Supreme Court stated that to that date, "the abnormal cases have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer: (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim. *Slade*, 747 So. 2d 306-07.  In this case, Plaintiff has failed to produce substantial evidence to show that the circumstances of this case fit within any of these "extraordinary circumstance" categories that warrant submitting the issue of extraordinary bad faith to the jury.

Plaintiff also argues that Met Life failed to properly investigate the claim or subject the results of the investigation to a cognitive review.  An insurer is liable for 'abnormal' bad faith when it intentionally or recklessly fails investigate a plaintiff's claim or when it intentionally or recklessly fails to properly subject a plaintiff's claim to a cognitive evaluation or review. *Id.*  In taking this position, Plaintiff bears the burden of presenting "sufficient evidence of 'dishonest purpose' or 'breach of known duty, *i.e.*, good faith and fair dealing, through some motive of self-interest or ill will.'" *Singleton*, 928 So. 2d 287 (quoting *Slade*, 747 at So. 2d at 303-04).  Plaintiff's submissions fall short of this requirement.

Plaintiff argues that Met Life's failure to investigate is shown by the fact that Met Life never had Plaintiff evaluated by an independent physician, that Met Life ignored the opinions of Plaintiff's treating physician and the vocational expert,[7] and that Met Life ignored the opinion of Lynn Hare Phillips, an insurance expert, that Met Life conducted an improper investigation.  However, Plaintiff has not offered any evidence indicating that there was a dishonest purpose or motive of self-interest or ill will in Met Life's investigation and subsequent denial.  Based upon the facts of the case, taken in the light most favorable to him, Plaintiff at best can allege bad judgment or negligence; however, "more than bad judgment or negligence is required in a bad-faith action." *Singleton*, 928 So. 2d at 286-87; *see also Pioneer Services, Inc. v. Auto Owners Inc. Co.* 2007 WL 2059109 (M.D. Ala. 2007)

---

[7] Plaintiff's brief also references the fact that Met Life ignored the opinions of co-workers. By this the court assumes Plaintiff is referring to the declaration of Dr. C.E. Herrington.  However, this declaration was not produced until after a final denial had been issued by Met Life, and thus it was impossible for Met Life to ignore this information at the time of denial.

(granting summary judgment on bad faith because there was no evidence of dishonest purpose on the part of the insured).[8]

Additionally, Plaintiff has not shown that Met Life created its own debatable reason for denying Plaintiff's claim. This circumstance occurs when the very existence of the sole factual basis for denial of the claim is itself subject to dispute – for example, when the insurer relies on an oral statement by a claimant to an investigator, which the claimant denies making. *Jones v. Alabama Farm Bureau Cas. Ins. Co.*, 507 So. 2d 396, 400-01 (Ala. 1987). In this case, Met Life based its denial on Plaintiff's admission that he worked full time for stretches of at least one month. The fact that Plaintiff worked this schedule is undisputed. Plaintiff points to numerous alleged inaccuracies in Met Life's file that, he argues, call into question the accuracy of each and every statement and report generated by Met Life. However, creating a dispute as to other peripheral information contained in the file does not negate the fact that it is undisputed that Plaintiff was working a one-month-on-one-month-off work schedule. And it was the latter which formed the basis of Met Life's "debatable reason" to deny the claim.

Finally, it is clear that Met Life did not rely on ambiguous portions of the policies in question as its lawful reason for denying Plaintiff's claim. Plaintiff argues that the policy is ambiguous because it does not describe or define what constitutes part-time or full-time work. However, this argument overlooks the fact that Met Life terminated Plaintiff's benefits because it determined he was no longer disabled under the policy, not because of any ambiguities over what constitutes part-time as opposed to full-time work. It is certainly true that Met Life took Plaintiff's work schedule

---

[8] Because the court did not need to consider Lynn Hare Phillips expert testimony in reaching its decision, Defendants' Motion to Strike Testimony and Report of Lynn Hare Phillips (Doc. # 73) is due to be overruled as moot.

into account when making its decision to terminate benefits, but it did so because Plaintiff's own

work schedule arguably demonstrated his functional ability to work, not because there was an issue

over whether the hours he was working met the requirements of some undefined part-time schedule.[9]

 Met Life made the decision to terminate benefits because it determined that Plaintiff's ability to

work full-time for a month at a time demonstrated that he was no longer disabled, not based on any

ambiguity in the policy language. (Doc. 38-2 at 146).

For all these reasons, Met Life's motion for summary judgment on the extraordinary bad faith

claim is due to be granted.

**B.**      **Plaintiff's Motion for Summary Judgment on the Counterclaim filed by Defendants**[10]

Defendants' counterclaims assert that Met Life is entitled to restitution from Plaintiff in the

amount of benefits paid and premiums waived and to the return of benefits received by Plaintiff.

(Doc. # 23 at 22-23).   Plaintiff argues that Defendants' counterclaims should be barred by the

defenses of unconscionability, estoppel, and waiver. (Doc. # 42).   Plaintiff's initial brief does not

raise the issue of whether Defendants have established the elements of either of their counterclaims;

however, in his reply brief, Plaintiff asserts that Defendants have failed to meet their burden.  (*Id.*).

The court recognizes that the "party seeking summary judgment always bears the initial

responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*,

---

[9] Plaintiff also contests that Earnings provision language of "monthly period" and "during the same period" are ambiguous and belied by other definitions in the policy.  However, that is a red herring.  Met Life did not rely on these definitions when deciding to terminate Plaintiff's benefits.

[10] While Pyun is technically the Counterclaim Defendant, the court will continue to refer to him as Plaintiff for continuity purposes. Likewise, Met Life and Paul Revere will still be referred to as Defendants.

477 U.S. 317, 323 (1986).  Nevertheless, the court will briefly discuss Defendants' counterclaims before turning to the affirmative defenses asserted by Plaintiff.

### 1.  Defendants' counterclaims of Restitution and Money Had and Received

"The essence of the theories of unjust enrichment or money had and received is that facts can be proved which show that defendant holds money which in equity and good conscience belongs to plaintiff or was improperly paid to defendant because of mistake or fraud." *Foshee v. General Telephone Co. of Southeast*, 322 So. 2d 715, 717 (Ala. 1975).[11]  Based on the evidence submitted in response to Plaintiff's motion for summary judgment, it is clear that Defendants have properly raised the issue of whether the benefits paid to Plaintiff were paid to him because of mistake or fraud. The record is replete with statements from Met Life employees that Plaintiff informed them that he was working 20-35 hours per week.  Plaintiff argues that even if Defendants could prove mistake, it would be unfair to require a refund if the payee changed position in detrimental reliance on the excess payment.  This argument is simply a restatement of Plaintiff's position on estoppel, an affirmative defense which is addressed below.  Because there is sufficient evidence in the record to create a genuine issue of fact regarding whether the benefits paid to Plaintiff were paid because of mistake or fraud, summary judgment is not appropriate.  Notwithstanding this Rule 56 finding, in order to fully respond to the parties' arguments, the court further addresses Plaintiff's contentions that even if Defendants could prove the elements of their claims, he is entitled to summary judgment because there is no material issue of fact and Plaintiff is entitled to judgment as a matter of law on his affirmative defenses of unconscionability, estoppel, and waiver.

---

[11] Met Life seeks Restitution of Benefits Paid under the theory of unjust enrichment. (*See* Doc. # 23 at 22-23)("Dr. Pyun has been unjustly enriched to the extent of the residual benefits that he has received from Met Life during that time, together with interest thereon.").

### 2.    Affirmative Defenses

Before turning to the merits of Plaintiff's affirmative defenses, the court must first address whether the defenses of unconscionability and waiver were waived by Plaintiff's failure to plead said defenses in his answer.[12]  Defendants argue that because Plaintiff did not raise these defenses in his answer, he should be barred from raising them at the summary judgment stage of litigation. However, because Defendants had notice of these defenses prior to submitting their response to Plaintiff's motion for summary judgment and because there is no indication that Defendants were prejudiced by the delay in such notice, the court will consider Plaintiff's arguments with regard to unconscionability and waiver. *See Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989) (holding that an affirmative defense was not waived when it was raised in a motion for summary judgment and there was no prejudice to plaintiff); *Harbor Village Home Center, Inc. v. Thomas*, 882 So. 2d 811, 818 (Ala. 2003) (holding that "[a]n affirmative defense, including unconscionability, not pleaded *before* the trial court's ruling on a motion for summary judgment . . . is deemed waived")(emphasis added).

### a.    Unconscionability

Plaintiff argues that it would be unconscionable to require him to repay Defendants for three reasons: (1) because Plaintiff always fully disclosed information requested of him by Defendants, (2) because the insurance policy language is ambiguous, and (3) because Defendants created their own debatable reason to deny Plaintiff benefits. (Doc. # 42).

---

[12] Plaintiff's Third Affirmative Defense as set out in his Answer to Amended Counterclaim pleads the defense of Estoppel. (Doc. # 24 at 3).

With regard to Plaintiff's first argument, there is an obvious question of fact as to whether Plaintiff fully disclosed the nature of his work schedule when asked by Defendants. Defendants have produced Rule 56 evidence which indicates that on a number of occasions when Plaintiff was asked about work, he indicated that he was working 20-35 hours a week. (*See* Docs. # 61-1, 61-2, 61-3). Given this evidence it is for the trier of fact to determine whether Plaintiff fully disclosed the nature of his work schedule. Plaintiff also argues that it would be unconscionable to require him to repay Defendants because the policy language was ambiguous. However, as discussed in section III.A.3 above, there is no ambiguity as to the pertinent policy language that is relevant to a determination of whether Plaintiff was disabled. Finally, the question of whether Defendants created their own debatable reason to deny Plaintiff's benefits was also previously addressed by this court in section III.A.3. For the reasons discussed in that section, there is sufficient evidence in the Rule 56 record to show that Defendants did not create their own debatable reason for denying Plaintiff's claim.

Accordingly, Plaintiff has failed to show that there are no material issues of fact and that he is entitled to judgment as a matter of law on the issue of unconscionability

### b.     Estoppel

Estoppel has three important elements. "The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies on that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct." *Hughes v. Mitchell Co., Inc.*, 49 So. 3d 192, 200 (Ala. 2010) (internal quotations and citations omitted). In this case, Plaintiff bears the burden of proving that all three elements of estoppel are met. *General American Life Ins. Co. v. AmSouth Bank*, 100 F.3d 893, 899 (11th Cir. 1996). Here, Plaintiff has failed to meet his burden

because he has not shown that Defendants had knowledge of the true facts. Indeed, in some respects there is a question for the jury to decide about what the true facts are in this case.

There is also a genuine issue of fact as to whether Met Life knew, while it was paying Plaintiff's disability benefits, that Plaintiff was working a schedule where he worked one month and was off the following month. Plaintiff argues that this element is met because Defendants had eight years to obtain a work schedule from Plaintiff. However, even if Plaintiff could point to any case law supporting his contention that this type of constructive knowledge is sufficient, a question of fact remains as to whether Met Life did in fact inquire into Plaintiff's work schedule and the number of hours he was working.

###        c.        Waiver

Waiver is defined as "the voluntary surrender or relinquishment of some known right, benefit, or advantage." *Hughes v. Mitchell Co., Inc.*, 49 So. 3d 192, 201-02 (Ala. 2010). The party claiming waiver as an affirmative defense bears the burden of proving that a known right was voluntarily relinquished. *Bentley Sys., Inc., v. Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005). Plaintiff argues that Defendants waived their right to claim restitution and money had and received by paying him benefits for eight years and failing to investigate his work schedule after issuance of the policy. However, as with estoppel, there is a question of fact as to Defendants' knowledge of Plaintiff's work schedule during the eight years it paid Plaintiff benefits. Plaintiff argues that even if Defendants did not have actual knowledge, they had constructive knowledge because Defendants "had ample opportunities to obtain a work schedule from Pyun for eight years and failed to do so." (Doc. # 67 at 9). However, again, Plaintiff has not pointed to any case law indicating that constructive knowledge is sufficient to establish waiver. But even if constructive knowledge were sufficient, a

question of fact still remains as to whether Defendants should have inquired further into Plaintiff's work schedule given Defendants' assertions and proffered evidence indicating that they did make such inquires into the nature Plaintiff's work schedule and were misled.  Accordingly, Plaintiff's motion for summary judgment on the waiver defense is due to be denied.

For the reasons mentioned above, Plaintiff's Motion for Summary Judgement on the Counterclaim Filed by Defendants (Doc. # 41) is due to be denied.[13]

## C.    Defendant Paul Revere's Motion for Summary Judgment

### 1.    Breach of Contract Claim

The basis for Plaintiff's breach of contract claim against Defendant Paul Revere is a reinsurance agreement and corresponding service agreement between Defendant Paul Revere and Defendant Met Life.[14]   (Doc. # 56).  As Paul Revere correctly points out, an essential element to a breach of contract claim is a valid contract binding the parties in the action.  *Gilmer v. Crestview Memorial Funeral Home, Inc.*, 35 So. 3d 585, 594 (Ala. 2009) ("A plaintiff can establish a breach-of-contract claim by showing: (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.").  A review of the contracts at issue makes it clear that Plaintiff is not a party to these agreements.  (Doc # 64; 64-1).  However, Plaintiff contends that he is entitled recover under the contract for two

---

[13]  Because the court did not consider the testimony of Dr. C.E. Herrington in its determination that Plaintiff's Motion for Summary Judgment to be denied, Defendants' Motion to Strike Testimony of Dr. C.E. Herrington is due to be overruled as moot.

[14]  The agreement is between Paul Revere and New England Mutual Life Insurance Company (see Docs. # 64; 64-1).  However, it is undisputed that Met Life is the successor of New England Mutual Life Insurance Company.

reasons: first, the agreements between Paul Revere and Met Life specifically create such liability; and second, Plaintiff is a third party beneficiary to the agreements.

"In Alabama, a reinsurer . . . is liable to the policyholders if the reinsurance contract specifically provides for such liability." *Am. Benefit Life Ins. Co. v. Ussery*, 373 So. 2d 824, 829 (Ala. 1979) (quoting *United States Fire Ins. Co. v. Smith*, 164 So. 70 (Ala. 1935)). In other words, under Alabama law, Paul Revere would be liable to Plaintiff if the reinsurance agreement specifically provided for such liability.  However, there is nothing in the reinsurance agreement indicating that Paul Revere assumed this direct liability to policy holders.  In *Ussery*, the court found that the reinsurance agreement showed that the reinsurer agreed to assume liability for the block of policies instead of merely agreeing to indemnify the reinsured. *Ussery*, 373 So. 2d at 829; *see also United States Fire Ins. Co. v. Hecht*, 164 So. 64 (Ala. 1935) (holding that the reinsurer agreed to be bound by the terms and conditions of the several policies and to relieve the insurer from any and all claims under the policy). But *Ussery* and *Hecht* are distinguishable from the current case because here the reinsurance agreement provides only that Paul Revere will indemnify Met Life for a portion of the benefits paid — it does not provide for direct liability.  Rather the liability section of the reinsurance agreement provides that "[f]or the claims incurred after December 31, 1989, Paul Revere indemnifies [Met Life] for 80% of policy benefits paid on policies reinsured under this agreement." (Doc. 64 at 7).  The court in *Ussery* indicated that it found the reinsurer liable on the policies because it agreed to assume liability as opposed to "merely agreeing to indemnify" the reinsured. *Ussery*, 373 So. 2d at 829.  Thus, the indemnification agreement between Met Life and Paul Revere is distinct from one that provides direct liability to the policy holders. *See United States Fire Ins. Co. v. Smith*, 164 So.

31

70, 75-76 (Ala. 1935)(recognizing that a reinsurance contract where the reinsurer agrees to indemnify the reinsured does not give the insured the right to sue the reinsurer).

In arguing that the reinsurance agreement does provide for direct liability to the policy holders, Plaintiff quotes language from the Service Agreement. However, the point is as tautological as it is true – the relevant language for determining whether direct liability exists under the contract is the language of the contract itself, and in this case the key language is found in the liability section of the reinsurance agreement (quoted above). Because the court finds that the reinsurance agreement does not render Paul Revere directly liable to Plaintiff, the court will turn to Plaintiff's alternative argument that he is a third party beneficiary of the contract.

It is well settled in Alabama that a third party has no rights under a contract between others unless the contracting parties intend that the third person receive a direct, as opposed to incidental, benefit from the contract. *Locke v. Ozark City Bd. of Educ.*, 910 So. 2d 1247, 1250 (Ala. 2005). "To recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached." *Id.* "As a general rule, it is appropriate for a court to examine the contract documents as well as the surrounding circumstances in resolving the question of whether the parties intended to directly benefit a third party." *Federal Mogul Corp. v. Universal Const. Co.*, 376 So. 2d 716 (Ala. Civ. App. 1979).

Plaintiff argues that he was an intended beneficiary of the agreements between Paul Revere and Met Life, and that Paul Revere and Met Life intended to confer a benefit on him by allocating financial responsibilities and liabilities between themselves. Plaintiff argues that he benefits from

32

the agreements because the service agreement states that Paul Revere will provide complete claims handling services for his insurance contract, including the right to pay claims. Plaintiff's argument assumes too much. That is, he is essentially asserting that because he received some benefit from the agreement between Defendants, he is an intended beneficiary of that contract. However, Plaintiff overlooks a critical point – no *additional* benefit is bestowed upon him by the contract between the Defendants. Rather, he is merely reaping the benefits of his original insurance contract with Met Life. Any additional benefits Plaintiff received from the contract in question are merely incidental. *See Zeigler v. Blount Brothers Construction*, 364 So. 2d 1163, 1167 (Ala. 1978)(holding that power company's customers were not third party beneficiaries to a contract between the power company and persons who allegedly negligently constructed and inspected a dam which supplied power to the power company even though those customers might have ultimately a been charged a reduced rate upon successful completion of the dam).

Because the reinsurance agreement in question does not provide for Paul Revere's direct liability to Plaintiff and because Plaintiff is not a third party beneficiary to that reinsurance agreement, Paul Revere is entitled to judgment as a matter of law on the breach of contract claim.[15]

---

[15]Further, even if Plaintiff could be deemed a third party beneficiary to the reinsurance and service agreements between Paul Revere and Met Life, it is, at best, doubtful that Plaintiff has produced substantial evidence to maintain a claim based on those agreements. Plaintiff argues that Paul Revere breached its contract with Plaintiff for the same reasons stated in Plaintiff's response to Met Life's Motion for Summary Judgment. However, those arguments concern a breach of the insurance contract between Plaintiff and Met Life. Plaintiff has not offered any evidence as to a breach of the reinsurance and service agreements between Met Life and Paul Revere, the contracts to which he claims is a third party beneficiary.

### 2.      Bad Faith Claims

As previously noted, Alabama recognizes two forms of bad faith: the "ordinary" case and the "extraordinary" case. *See State Farm Fire & Casualty Comp. v. Slade*, 747 So. 2d 293, 306 (Ala. 1999). "Certain elements are common to both the ordinary and the extraordinary forms of bad faith: (1) the existence of an insurance contract between the parties; (2) an intentional refusal to pay the insured's claim; and (3) the insured's contractual entitlement to payment of the claim." *Preis v. Lexington Ins. Co.*, 508 F.Supp.2d 1061, 1077 (citing *Slade*, 747 So. 2d at 316-18). For the reasons explained above, there is no contractual relationship between Paul Revere and Plaintiff.  Thus, Plaintiffs claims for bad faith necessarily fail as a matter of law. Further, even if Paul Revere could be held liable for the tort of bad faith, summary judgment on the bad faith claims would still be appropriate for the reasons discussed in sections I.B.2 and I.B.3.

### 3.      Negligence Claim

"The existence of a duty to the plaintiff is fundamental to a negligence claim." *Akpan v. Farmers Ins. Exch., Inc.*, 961 So. 2d 865, 873 (Ala. Civ. App. 2007) (quoting *Patrick v. Union State Bank*, 681 So. 2d 1364, 1367 (Ala. 1996) (internal quotations omitted).  The question of whether a legal duty exists is a question of law. *Patrick*, 961 So. 2d at 1368.  "In determining whether a duty exists, the court considers factors including public policy; social considerations; foreseeability; the nature of the defendant's activity; the relationship between the parties; and the type of possible injury or harm." *Akpan*, 961 So. 2d at 873.  In deciding whether an independent adjustor or investigator with whom an insurance company contracts for the investigation and adjustment of claim owes a duty to the insured, the Alabama Court of Civil Appeals is in agreement with the majority of courts from other jurisdictions in holding that such an adjustor or investigator owes a duty only to the

insurance company that hired it. *Id.*; *see also Equipment Contractors Corp. v. North River Ins. Co.*, 2007 WL 2081477 (S.D. Ala. 2007)(finding that a third-party claims adjuster's duties and loyalties lie with the insurer, rather than the insured).

Thus under Alabama law, Paul Revere owed a duty to Met Life, the party with whom it contracted to administer Plaintiff's claims – not Plaintiff. Plaintiff argues that the policy considerations cited by the Court in *Akpan* do not apply in this case because Paul Revere had the power to make decisions on Plaintiff's claim. While that may be true, it is inapposite. The Alabama Court of Civil Appeals also quoted another policy consideration which is more on point – "imposing a duty on the adjuster in these circumstances would work a fundamental change in the law . . . the law of agency requires a duty of absolute loyalty of the adjuster to . . . the insurer." *Akpan*, 961 So. 2d at 873. This consideration is equally important in this case given the contractual relationship whereby Paul Revere administers claims on behalf of Met Life. Because Alabama law is clear that Paul Revere did not owe a duty to Plaintiff, Plaintiffs claim for negligence against Paul Revere cannot stand as a matter of law.

Further, to the extent Plaintiff contends that Paul Revere is liable for directly handling his claim, the Alabama Supreme Court has "expressly rejected any cause of action based upon an insurer's negligence in handling direct claims." *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 5 (Ala. 1981) (reaffirming the position that a cause of action does not exist based on an insurer's negligence in handling direct claims); *Kervin v. Southern Guar. Ins. Co.*, 667 So. 2d 704, 706 (Ala. 1995) ("[T]his Court has consistently refused to recognize a cause of action for the negligent handling of insurance claims.").

Because as a matter of law Plaintiff cannot maintain an action against Paul Revere sounding in negligence, summary judgment is due to be granted on the negligence claim.

### 4.      Breach of Fiduciary Duty Claim

Plaintiff concedes that Alabama has no binding precedent on the specific issue of whether there is a fiduciary relationship between a claims adjuster and an insured.  Given the decision of the Alabama Court of Civil Appeals in *Akpan*, this court is hard pressed to see how fiduciary duty can exist where, as a matter of law, there is no duty even in a negligence context.  In *Akpan*, the court stressed that the duty of loyalty was between the insurer and the adjuster but not between the adjuster and the insured. *Akpan*, 961 So. 2d at 973.

Even assuming such a duty could exist between Plaintiff and Paul Revere, a fiduciary duty cannot exist absent a fiduciary relationship.  The Alabama Supreme Court has recently defined a fiduciary or confidential relationship as follows:

> A confidential relationship is one in which one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.

*DGB, LLC v. Hinds*, __ So. 3d __, 2010 WL 2629411 (Ala. June 30, 2010)(internal citations omitted).  Given this definition, it is clear to this court that a fiduciary or confidential relationship did not exist between Paul Revere and Plaintiff.  Paul Revere acted merely as claims administrator,

it did not take on the role of counselor or advisor such to create a relationship that support a claim for breach of fiduciary duty.

Because Plaintiff cannot establish that Paul Revere owed him a fiduciary duty, Defendant is entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Paul Revere's motion for summary judgment (Doc. # 34) is due to be granted; Defendant Met Life's motion for summary judgment (Doc. # 36) is due to be granted in part and denied in part; Plaintiff's motion for summary judgment on the counterclaim filed by defendants (Doc. # 41) is due to be denied; Defendants' motion to strike testimony of Dr. C.E. Herrington (Doc. # 58) is due to be overruled as moot[16]; and Defendants' motion to strike testimony and report of Lynn Hare Phillips (Doc. # 73) is also due to be overruled as moot.[17]   In summary, the following claims remain viable: Count 1 of Plaintiff's Amended Complaint and Count 1 and Count 2 of Defendants' Amended Answer.

The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____3rd_____ day of March, 2011.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[16] Because the court did not consider the challenged portions of Dr. Herrington's declaration in its decision, Defendants' motion to strike is due to be overruled as moot.

[17] Because the court did not consider Ms. Phillip's testimony in its decision, Defendants' Motion to Strike is due to be overruled as moot.